ORIGINAL

ECF

FILED
JUL 11 2006
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
*(Procurement Protest)*

BLUE & GOLD FLEET, L.P.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 06-514 C

**COMPLAINT**

1. This matter concerns the legality of the award of Concessions Contract #CC-GOGA001-06 (a contract to provided ferry services to and from Alcatraz Island and San Francisco) made by the National Park Service on May 9, 2006 in contravention of the terms of 16 U.S.C. § 5952(4)(D) which expressly preclude the award of a concessions contract which materially modifies the contract set forth in the applicable prospectus upon which offers were solicited and evaluated.[1]

[1] While the propriety of NPS' evaluation of proposals received in response to NPS' solicitation and NPS' concomitant selection of Hornblower Yachts, Inc. ("Hornblower") was the subject of protest litigation before the court in COFC No. 05-1203, plaintiff does not believe that the instant case expressly meets the definition of a Directly Related Case as set forth in RCFC 40.2(a)(1). The issues in COFC No. 05-1203 have little relevance to the issue in the present case (the propriety of a material modification to the draft contract on the eve of award). Additionally, the assignment of this case to the same judge that handled the prior protest would not conserve judicial resources or promote an efficient determination of the merits because this protest raises entirely new legal issues based upon facts not raised in the prior protest. Moreover, the facts and issues raised in the prior protest are not significant for this case.

2. Plaintiff Blue & Gold Fleet, L.P. ("Blue & Gold") is the incumbent contractor currently providing ferry services to and from Alcatraz Island and San Francisco pursuant to a concession contract with the United States Department of the Interior's National Park Service ("NPS").

3. On July 27, 2004, NPS issued a prospectus (Ex. 1 hereto) for a new concession contract to provide ferry services to and from Alcatraz Island and San Francisco by the United States Department of the Interior in accordance with the requirements of the Concessions Management Improvement Act, 16 U.S.C. § 5951 et seq. ("CMIA").

4. In addition to water and land transportation services to the public, the solicitation also provided that the successful offeror was required to provide a variety of services that directly benefit the government.

5. Among other things, the solicitation also indicated that each offeror was required to demonstrate both its financial capability and that its proposal was financially viable. Ex. 1 (Tab V, Proposal Package p. 19).

6. The solicitation contained no indication that the services in question were covered by the Service Contract Act ("SCA"), i.e., it contained no wage determination issued by the Department of Labor ("DOL") or any clauses indicating that the successful offeror would be required to pay SCA wages and benefits to its employees. The prospectus did, however, include a draft of the contract that NPS was to execute with the successful

offeror. See Ex. 1 (Tab III). Nothing in that draft contract required the successful offeror/contractor to pay SCA wages and benefits to its employees. Id.

7. Proposals in response to the prospectus were submitted on or before March 30, 2005.

8. After evaluating the proposals submitted, by letters of September 26, 2005, NPS notified offerors that the proposal submitted by Hornblower had been selected as the best proposal.

9. Thereafter, on October 6, 2005, Blue & Gold filed a protest with the General Accountability Office ("GAO") challenging NPS' selection decision.

10. By letter of November 2, 2005, rather than transmitting a report on the protest as requested by the GAO and required by 31 U.S.C. § 3553(a)(2) and 4 C.F.R. § 21.3(c), NPS advised GAO that it "will not submit a report in response to the protest," requested that GAO dismiss the protest for lack of jurisdiction and recommended that in the future any challenges to NPS selections or awards regarding concessions contracts be filed at the Court of Federal Claims ("COFC").

11. Although Blue & Gold did not and does not agree that GAO lacked jurisdiction, given the circumstances, Blue & Gold nevertheless chose to initiate bid protest litigation in the COFC, COFC No. 05-1203, relating to the improper evaluation of proposals, an action which caused GAO to dismiss Blue & Gold's protest on December 1, 2005.

12. In the protest litigation at the COFC, among other things, Blue & Gold alleged that NPS had improperly evaluated the viability of Hornblower's proposal and Hornblower's concomitant ability to pay the handsome franchise fee (25.5 % of gross receipts) that it had proposed.[2] The basis of Blue & Gold's protest in this regard was that:

- whether or not indicated in the solicitation, the SCA applied to the services to be provided under the contract;
- as such, whoever was the successful offeror would have to pay its employees the wages and benefits required by the SCA;
- accordingly, the cost realism analysis that the prospectus indicated would be performed had to be done for each offeror on the basis of the offeror's paying those SCA wages and benefits;[3]
- NPS' cost realism analysis of Hornblower's proposal, which was done on the basis of the much lower wages and benefits that Hornblower, a non-union operator, proposed to pay, was wholly improper.

13. Shortly thereafter, two unions whose members are employed by Blue & Gold on the Alcatraz service submitted a request to the DOL for a determination that the SCA does

---

[2]The franchise fee of 25.5% of gross receipts proposed by Hornblower was very high given that the current franchise fee being paid by Blue & Gold is only 15.4% of gross receipts and the minimum franchise fee set out in the prospectus for the new contract was 21.5%.

[3]Since Blue & Gold is a union contractor and thus pays wages and benefits in accordance with several collective bargaining agreements, pursuant to 41 U.S.C. § 353(c), those wages and benefits would therefore be the SCA wages and benefits that the successful offeror would be required to pay.

apply to both the existing Alcatraz contract being performed by Blue & Gold and the contract putatively to be awarded to Hornblower. Ex 2.

14. DOL, due in no small part to delays caused by NPS, has yet to rule on the unions' request.[4]

15. In the proceedings at the COFC, NPS alleged that Blue & Gold's assertions were nothing more than an untimely challenge to NPS' determination that the SCA did not apply. Moreover, throughout the proceedings, NPS argued vehemently that not only did the SCA not apply to the Alcatraz contract but that the SCA did not apply to any NPS concessions contract. Stated another way, while § 5 of the draft contract contained in the prospectus indicated that operations under the contract "shall be subject to all Applicable Laws,"[5] NPS made it clear that it did not believe that the SCA or any other law requiring the contractor to pay prevailing wages was encompassed within the term "Applicable Laws."

---

[4]Those unions filed a request for a determination on the applicability of the SCA to the Alcatraz contract with DOL on November 30, 2005. On January 6, 2006, DOL sent a letter to NPS impliedly endorsing such applicability and requesting a response within 21 days. NPS failed to respond, however, until April 7, 2006, some 2½ months after the original response due date.

[5]The term "Applicable Laws" is, in turn, defined in § 2 of the draft contract contained in the prospectus as "the laws of Congress governing the [Golden Gate National Recreation Area ("GGNRA")], including, but not limited to the rules, regulations, requirements and policies promulgated under those laws (e.g., 36 C.F.R. Part 51), whether now in force, or amended, enacted or promulgated in the future, including without limitation, federal, state and local laws, rules, regulations, requirements and policies governing nondiscrimination, protection of the environment and protection of public health and safety." Ex. 1 (Tab III, Draft Contract at 2 of 30 (¶ 2(a)).

16. On March 6, 2006, the COFC issued its decision, 70 Fed. Cl. 487, wherein, among other things, the court concluded that Blue & Gold's allegation that NPS had improperly failed to evaluate Hornblower's labor costs on the basis that paying SCA wages and benefits was required was a mere challenge to the terms of the solicitation and, therefore, was untimely since it was not brought before the date for receipt of proposals.[6]

17. Consistent with its notification obligation under 16 U.S.C. § 5952(6) and 36 C.F.R § 51.22, on March 7, 2006, NPS submitted a copy of the contract that it proposed to award to Hornblower to the Congressional committees designated in the CMIA. A copy of the proposed contract, signed by Hornblower on March 7, 2006 that NPS sent to the two Congressional Committees on that date, is attached hereto as Ex. 3. In this regard, NPS' regulations state that:

> Before awarding a concession contract with anticipated annual gross receipts in excess of $5,000,000 or of more than 10 years in duration, or, pursuant to § 51.24(b), the Director must submit the concession contract to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate. The Director must not award any such concession contract until 60 days after the submission. Award of these contracts may not be made without the Director's written approval. The Director may not delegate this approval except to a Deputy Director or an Associate Director.

36 C.F.R. § 51.22. Under the regulation, since the Director of NPS submitted the proposed contract to be awarded to Hornblower to Congress on March 7, 2006, by statute, the earliest that that contract could have been awarded was May 8, 2006.

---

[6]Blue & Gold has appealed that ruling to the Federal Circuit, No. 06-5064.

18. Shortly after the COFC ruled on Blue & Gold's protest and the Director of NPS submitted the proposed contract to be awarded to Hornblower to the Congress as she was statutorily required to do as a condition precedent to awarding that contract, the two unions whose members work for Blue & Gold on the Alcatraz ferry service filed suit in U.S. District Court for the Northern District of California.[7]

19. Each of those lawsuits sought a declaratory judgment that the SCA did, in fact, apply to both the existing Alcatraz contract being performed by Blue & Gold and the contract putatively to be awarded to Hornblower. Both also sought a preliminary and permanent injunction against NPS' proposed award to Hornblower.

20. After briefing and a hearing, in which both NPS and Hornblower participated, by order dated May 1, 2006, the District Court issued a preliminary injunction (Ex. 4 hereto) against the award of the proposed contract to Hornblower. In that order and the more extensive opinion issued on May 26, 2006 (also attached as part of Ex. 4), the district court concluded, among other things, that based on the plain language of the SCA and the necessary deference to DOL's regulation on the scope of the SCA, the unions would likely succeed on the merits of their argument that the proposed contract was in violation of the SCA for not requiring that the contractor pay the wages and benefits required by the SCA, i.e., the wages and benefits contained in the unions' collective bargaining

[7] International Organization of Masters, Mates & Pilots, Pacific Maritime Region. v. National Park Service, *et al.*, No. 06-2107 (N.D. Cal.) (filed March 21, 2006), and Inlandboatman's Union of the Pacific, Marine Division, ILWU v. Fran Mainella, *et al.*, No. 06-2152 (N.D. Cal.) (filed March 23, 2006) ("Unions' Lawsuits").

agreements with Blue & Gold. Id. at 20. The court's order specifically stated in pertinent part that:

> Defendants are preliminarily enjoined from awarding a contract, for the continuation of water transportation services between the City of San Francisco and Alcatraz Island and related services, that permits any contractor or subcontractor under it to pay its employees providing services under such contract less that the wages and fringe benefits specified in Plaintiffs' collective bargaining agreements with Blue and Gold Fleet, LLP, including any prospective increases in wages and fringe benefits specified in such collective bargaining agreements.

21. The District Court's order notwithstanding, by letter agreement dated May 8, 2006 (Ex. 5 hereto), NPS and Hornblower agreed (1) to modify the term "Applicable Laws" in the contract proposed to be awarded to Hornblower so as to include the Order issued by the District Court on May 1, 2006 within that term for as long as that Order remained in effect, (2) in accordance with the amended "Applicable Laws," that "neither Alcatraz Cruises, LLC, nor any of its subcontractors will pay its employees providing services under the Contract less than the wages and fringe benefits specified in [the union's] collective bargaining agreements with Blue & Gold Fleet, LLP, [sic] including any prospective increases in wages and fringe benefits specified in such collective bargaining agreements," and (3) to incorporate the letter modification into the contract proposed to be awarded to Hornblower.

22. With this and one other letter agreement incorporated in the proposed contract, NPS awarded the amended contract to Hornblower on May 9, 2006. See NPS Press Release

(Ex. 6).[8] A copy of the "awarded" contract is attached as Ex. 7. That is, based on modifications made to the proposed contract on the day before award to Hornblower, which, among other things, effectively required the payment of SCA wages and benefits, NPS made an award to Hornblower. This action was taken notwithstanding the fact that:

a. the solicitation, by NPS' own admission, never advised potential offerors that the contractor would be required to pay SCA wages,

b. Hornblower had, therefore, not proposed to pay the prevailing wages and benefits in the proposal that it submitted in March of 2005, and most importantly

c. the financial viability of Hornblower's proposal was never evaluated by NPS on the basis of Hornblower's paying prevailing wages and benefits, and lastly

d. as the district court has indicated, there was no compelling urgency to award the new concessions contract. Ex. 4 (International Organization of Masters, Mates & Pilots, Pacific Maritime Region, v. National Park Service, *et al.*, No. 06-2107, Inlandboatman's Union of the Pacific, Marine Division, ILWU v. Fran Mainella, *et al.*, No. 06-2152, slip op. at 21 (N.D. Cal. May 26, 2006) ("Slip op.")).

23. Because of this eleventh-hour material modification of the contract to be awarded, the award that putatively took place on May 9, 2006 was illegal, having been accomplished in total contravention of statute. In this regard, the CMIA is unequivocal in precluding exactly what NPS did here, i.e.:

---

[8] By the second letter agreement, also entered into the day before award, a copy of which is attached as Ex. 7, NPS amended the Operating Plan contained in proposed contract so as to relieve Hornblower of numerous performance deadlines set out in the version of the contract which NPS submitted to Congress for review on March 7, 2006. See note 11, infra.

> The Secretary may not execute a concessions contract which materially amends or does not incorporate the proposed terms and conditions of the concessions contract as set forth in the applicable prospectus.

16 U.S.C. § 5952(4)(D).

24. The statute is equally unequivocal in its direction to the Secretary as to what should be done in such circumstances, i.e.:

> If proposed material amendments or changes are considered appropriate by the Secretary, the Secretary shall resolicit offers for the concessions contract incorporating such material amendments or changes.

Id.

25. Given the District Court's determination on May 1, 2006 that the SCA did, in fact, apply to the Alcatraz contract, and its prohibition of NPS' making the award of any contract that did not require the payment of such SCA-dictated wages and benefits, 16 U.S.C. § 5952(4)(D) provided NPS with two choices and only two choices -- (1) resolicit offers on the basis that the ultimately successful offeror will have to pay SCA wages and benefits or (2) refrain from awarding the contract until NPS could, if ever, legally proceed to an award without requiring the contractor to pay the prevailing wages and benefits, i.e., wait until after, if ever, the District Court's injunction was reversed.[9]

26. The factors generally applied in determining the materiality of a modification are (1) whether the modification is of a nature which potential offerors would reasonably have

[9] Again, as the District Court indicated, there was no compelling urgency to award the new concessions contract. Ex. 4 (Slip op. at 21).

anticipated and (2) whether the modification substantially changes in the type of work, performance period and costs of performance. Portfolio Disposition [full cite], 64 Fed. Cl. at 12; Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 106 (2004); Neil R. Gross & Co. Inc., B-237434, 90-1 CPD ¶ 212 (citing Am. Air Filter Co., Inc., B-188408, 78-1 CPD ¶ 136).

27. The amendment of the term "Applicable Laws" so as to incorporate an obligation that the contractor not to pay its employees wages and benefits less than the prevailing wages and benefits required by the SCA was not a change of the type specifically authorized or even foreseen in the draft contract included in the prospectus.

28. Prior to the modification in question, NPS had consistently taken the position that there is no requirement in the law (and certainly none in the draft contract included in the prospectus) for the NPS concessioner to have to pay the prevailing wages and benefits required by the SCA. Indeed, as late as its opposition to the unions' motions for a preliminary injunction from the District Court on April 28, 2006, NPS was vociferously arguing that:

> "NPS' position is that the SCA does not apply to NPS concession contracts . . ."

Federal Defendant's Corrected Opposition to Plaintiffs' Motion for Preliminary Injunction at 23. (Ex. 8 hereto.)[10]

[10]While NPS is, as the District Court found, wrong as to the inapplicability of the SCA to the Alcatraz contract (and other concession contracts involving transportation services), NPS' position that the SCA in inapplicable has been consistent, i.e., it advocated this position before

29. The obligation to pay the wages and benefits required by the SCA (here union wages and benefits) has significant cost implications for a non-union operator such as Hornblower on a fairly labor-intensive contract with a 10-year term such as the Alcatraz contract is. (Based on Blue & Gold's staffing levels, the Alcatraz contract will require approximately 500 man-years of labor to accomplish.)

30. The total additional costs that Hornblower will incur as a result of the modification will likely run into many millions of dollars over the term of contract. Such being the case, there is no question but that the modification substantially changed the costs of performance to an amount far in excess of that upon which Hornblower's proposal was evaluated for cost realism and financial viability by NPS.

31. The modification was material amendment to the proposed terms and conditions of the concessions contract set forth in the prospectus and the execution of a contract on May 9, 2006 containing that modification was done in direct contravention of 16 U.S.C. § 5952(4)(D), which specifically precludes such an action in these circumstances.

32. On May 10, 2006, NPS issued a press release stating that it awarded the Alcatraz contract to Hornblower and that it had "incorporated" the May 1, 2006 preliminary injunction issued by the United States District Court for the Northern District of California into the contract. On May 17, 2006, Blue & Gold received the contract, as awarded, whereupon it

---

the District Court, throughout Blue & Gold's protest at the Court of Federal Claims, during Blue & Gold's request for an injunction pending appeal and in response to the unions request for a ruling from DOL on the applicability of the SCA to the Alcatraz contract.

learned that NPS had materially modified the proposed contract by amending the definition of "Applicable Laws." On May 30, 2006 Blue & Gold filed a protest against the award. Despite Blue & Gold having filed within the requisite period after its receipt of the awarded contract, at which time it learned the basis of its subsequent protest, GAO dismissed the protest as untimely, stating that the ten-day period began after NPS issued its press release on May 10.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) find that NPS' award of Concessions Contract #CC-GOGA001-06 was arbitrary, capricious, an abuse of discretion and not in accordance with law; AND

  (i) permanently enjoin NPS' performance of contract #CC-GOGA001-06, and

  (ii) direct NPS to resolicit offers for a new concessions contract for ferry services to and from Alcatraz incorporating the material changes which are the subject of this litigation; AND

(b) grant plaintiff its costs and attorney's fees incurred in pursuing this action and, to the extent applicable, its bid and proposal preparation costs; AND

(c) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 - facsimile

Counsel for Plaintiff

OF COUNSEL:

Ruth G. Tiger
Isaias Alba IV
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20005
(202) 452-2140
(202) 775-8217 - facsimile

Dated: July 10, 2006